[No. D057463. Fourth Dist., Div. One. June 6, 2011.]

FIRST AMERICAN COMMERICAL REAL ESTATE SERVICES, INC., Plaintiff and Respondent, v. COUNTY OF SAN DIEGO, Defendant and Appellant.

COUNSEL

John J. Sansone and Thomas E. Montgomery, County Counsel, and Timothy M. Barry, Deputy County Counsel, for Defendant and Appellant.

Best Best & Krieger, Bruce W. Beach and Brooke Miller for Plaintiff and Respondent.

OPINION

**IRION, J.**—County of San Diego (the County) appeals from a judgment ordering it, pursuant to Revenue and Taxation Code section 4985.2, subdivisions (a) and (b), to cancel and refund penalties paid by First American Commercial Real Estate Services, Inc. (First American), for late payment of real property taxes.[1] As we will explain, First American did not

---

[1] Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

establish the requirements for cancellation and refund under section 4985.2, subdivisions (a) and (b). We accordingly reverse the judgment.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

The County assesses annual real property taxes to the owners of real property in the County (§ 405), and collects tax payments from real property owners in semiannual installments due on November 1 and the following February 1. (§§ 2605, 2606.) For the second installment, taxes not paid by the end of the statutory grace period on April 10 incur a 10 percent penalty. (§§ 2702, 2705.)

The County reciprocal tax accounting (CORTAC) program allows lenders or other entities to make bulk payments of real property taxes—through a wire transfer to the County's bank—on behalf of the real property owners who are assessed property tax by the County. As we understand the CORTAC program, at least one of its uses is to allow lenders to transmit to the County the real property tax payments borrowers remit with their mortgage payments, which the lenders hold in impound accounts until the taxes become due. (Cf. *ZC Real Estate Tax Solutions Ltd. v. Ford* (2010) 191 Cal.App.4th 378, 380–381 [119 Cal.Rptr.3d 85] (*ZC Real Estate Tax Solutions*) ["Property owners often are required to (and sometimes do so voluntarily) pay a portion of their real estate taxes with each monthly mortgage payment. The lender holds these monthly tax payments in an escrow account until it is time to make tax payments to the local taxing authority."].)

First American provides tax services, including consolidated mass tax payment services, to banks, mortgage companies and other commercial loan servicers. First American services a number of clients in San Diego by coordinating their property tax payments to the County through the CORTAC program. First American acted as the tax service company for 14 clients with respect to the second installment of the 2007–2008 fiscal year property taxes in the amount of approximately $60 million owed to the County on 2,561 different real property parcels. Among First American's clients was Bank of America Capital Market (Bank of America), which retained First American as the tax service company to coordinate the payment of property taxes in the amount of $6,309,406[2] to the County through the CORTAC program for 123 real property parcels owned by a number of different assessees who were Bank of America borrowers.

As required by the CORTAC program, First American sent the County an electronic file identifying the 2,561 real property parcels for which it would

---

[2] Here, as in other instances, we have rounded to the nearest dollar.

be transmitting second installment 2007–2008 property tax payments on behalf of its clients. First American also sent the County a list identifying the amounts of the payments that would be wired for each of its 14 clients, with the amount of $6,309,406 listed for its client Bank of America.

Between April 4 and April 9, 2008, the County received 13 separate wire transfers of the property tax payments for 13 of First American's clients. However, First American failed to transmit the $6,309,406 payment on behalf of Bank of America by the April 10, 2008 payment deadline. According to First American, it failed to transmit Bank of America's payment by April 10, 2008, because of an internal error in formatting a spreadsheet used in making the wire transfers. Because of the formatting error, the amount that it was to transfer for the Bank of America payment was "inadvertently 'hidden,' " and therefore, the payment was overlooked.

When the County had not received a wire transfer of Bank of America's payment by the close of business on April 10, 2008, it e-mailed First American to notify it of the missing payment. The next morning, on April 11, 2008, First American wired $6,309,406 to the County for the Bank of America payment. Because the payment arrived after the April 10, 2008 deadline, the County imposed a 10 percent penalty in the amount of $594,942 as required by section 2705.[3] The penalty was imposed as a lien against the 123 real property parcels owned by the Bank of America borrowers.

First American then attempted to obtain cancellation of the penalty pursuant to section 4985.2. That provision states:

"Any penalty, costs, or other charges resulting from tax delinquency may be canceled by the auditor or the tax collector upon a finding of any of the following:

"(a) Failure to make a timely payment is due to reasonable cause and circumstances beyond the taxpayer's control, and occurred notwithstanding the exercise of ordinary care in the absence of willful neglect, provided the principal payment for the proper amount of the tax due is made no later than June 30 of the fourth fiscal year following the fiscal year in which the tax became delinquent.

---

[3] Section 2705 provides: "The second half of taxes on the secured roll, if unpaid, is delinquent at 5[:00] p.m., or the close of business, whichever is later, on April 10, and thereafter a delinquent penalty of 10 percent attaches to it." We recognize that $594,942 is less than 10 percent of $6,309,406. The record is not clear as to the reason for the discrepancy, and the parties raise no issue concerning the correct amount of the penalty.

"(b) There was an inadvertent error in the amount of payment made by the taxpayer, provided the principal payment for the proper amount of the tax due is made within 10 days after the notice of shortage is mailed by the tax collector.

"(c) The cancellation was ordered by a local, state, or federal court." (§ 4985.2.)

In its first formal step toward seeking cancellation, First American sent a letter to the County's treasurer/tax collector on April 25, 2008, requesting that the penalty be cancelled under section 4985.2, subdivision (b) because of "an inadvertent error in the amount of payment made by the taxpayer." On April 28, 2008, First American met with the County to discuss cancellation of the penalty under section 4985.2, subdivisions (a) and (b). On May 9, 2008, the County's chief deputy tax collector notified First American in writing that cancellation was not appropriate because neither subdivision (a) nor subdivision (b) was applicable.

First American remitted payment for the penalty "under protest" on May 9, 2008, by wire transfer.[4] It filed a verified claim for refund of the tax penalty with the County's board of supervisors on October 28, 2008. The County rejected the claim on December 15, 2008.

On February 5, 2009, First American filed this action against the County to obtain cancellation of the penalty pursuant to section 4985.2. As First American acknowledges, "[t]he correct procedure to assert a claim [in court] for cancellation and refund of tax penalties pursuant to Section 4985.2 is, admittedly, unclear." Therefore, First American filed a pleading containing three alternative procedural approaches: (1) a cause of action for "Refund of Tax Penalties,"[5] (2) a cause of action for declaratory relief, and (3) a petition for a writ of mandate.

The County filed an answer, and the trial court held a bench trial based on stipulated facts, declarations and exhibits, together with the parties' trial briefs and in-court argument.

---

[4] Bank records show the penalty payment coming from First American, and the parties have stipulated that First American paid the full amount of the penalty.

[5] Although the complaint did not identify a statutory provision as the procedural basis for the cause of action titled "Refund of Tax Penalties," First American's subsequent briefing identifies section 5140 et seq. as the basis for that cause of action. Section 5140 provides: "The person who paid the tax, his or her guardian or conservator, the executor of his or her will, or the administrator of his or her estate may bring an action only in the superior court . . . against a county . . . to recover a tax which the board of supervisors of the county . . . has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter. No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff."

The trial court issued a statement of decision, which included extensive findings of fact and reached several conclusions that are relevant here.

First, the trial court stated that although the Legislature did not identify the procedure by which taxpayers may challenge the denial of an application for cancellation of penalties under section 4985.2, a taxpayer may challenge such a denial either through a petition for a traditional writ of mandate (Code Civ. Proc., § 1085 et seq.) or an action for refund brought pursuant to Revenue and Taxation Code section 5140 et seq.

Second, the trial court determined that although First American was not the taxpayer, it had paid the penalty imposed by the County and thus had standing to bring a refund action under section 5140 and to file a petition for a writ of mandate as "the party beneficially interested" (Code Civ. Proc., § 1086).

Third, the trial court concluded that First American was entitled to cancellation of the penalty under both subdivisions (a) and (b) of section 4985.2. According to the trial court, although subdivision (a) of section 4985.2 requires that "[f]ailure to make a timely payment is due to reasonable cause and circumstances beyond the taxpayer's control, and occurred notwithstanding the exercise of ordinary care in the absence of willful neglect . . ." (*ibid.*), those requirements were met because (1) First American's error in formatting its spreadsheet "occurred notwithstanding its exercise of ordinary business care"; (2) a "failure to accomplish an intended wire payment because of the unintended and erroneous computer spreadsheet customer designation constitutes 'circumstances beyond the taxpayer's control' "; and (3) there was no willful neglect. The trial court also concluded that there had been "an inadvertent error in the amount of payment made by the taxpayer" as required by subdivision (b) of section 4985.2. Specifically, it explained that there was an inadvertent error in the amount that First American had transmitted on behalf of its 14 clients. According to the trial court, under the "unique procedure" of the CORTAC program, "[t]he inadvertent nonpayment of a portion of the total amount payable by a CORTAC participant [(i.e., First American)] falls within section 4985.2[, subdivision ](b)."

The trial court issued a writ of mandate directing the County to cancel the $594,942 penalty and refund it to First American (with interest calculated pursuant to § 5151), and it also ordered the same relief pursuant to section 5140 et seq.

The County appeals from the judgment.

## II

## DISCUSSION

### A. *Standard of Review*

Whether reviewing an order issuing a writ of mandate or a ruling in a tax refund action, our standard of review in this instance is the same.[6] We review the trial court's findings of fact for substantial evidence, and review its legal conclusions, including its interpretation of statutory provisions, under a de novo standard of review. (*Jackson v. Gourley* (2003) 105 Cal.App.4th 966, 970 [130 Cal.Rptr.2d 72] (*Jackson*); *County of Los Angeles v. Raytheon Co.* (2008) 159 Cal.App.4th 27, 34 [70 Cal.Rptr.3d 788] (*Raytheon*); *Fujitsu IT Holdings, Inc. v. Franchise Tax Bd.* (2004) 120 Cal.App.4th 459, 470 [15 Cal.Rptr.3d 473].)

### B. *The Requirements of Subdivision (a) of Section 4985.2 Are Not Satisfied Because the Late Payment Was Not Due to Circumstances Beyond the Taxpayer's Control*

■  To be entitled to cancellation of a penalty under subdivision (a) of section 4985.2 after a late property tax payment, a party must establish that "[f]ailure to make a timely payment is due to reasonable cause and circumstances beyond the taxpayer's control, and occurred notwithstanding the exercise of ordinary care in the absence of willful neglect . . . ." (*Ibid.*) If the statutory requirements are met, the County must cancel the penalty. (*Strumpfer, supra*, 139 Cal.App.4th at p. 1050.)

The statutory language contains four separate requirements: the delay in payment (1) was "due to reasonable cause," (2) was due to "circumstances beyond the taxpayer's control," (3) occurred "notwithstanding the exercise of ordinary care," and (4) occurred "in the absence of willful neglect." (§ 4985.2, subd. (a).) If any of these requirements are missing, First American is not entitled to cancellation of the penalty under subdivision (a) of section 4985.2.

As we will explain, we conclude as a matter of statutory interpretation that the clerical error that caused First American to make a late payment on behalf

---

[6] As it is unnecessary to our disposition to decide whether both a petition for a writ of mandate (Code Civ. Proc., § 1085) and a tax refund action (Rev. & Tax. Code, § 5140 et seq.) are proper procedures to challenge a county's denial of a cancellation request under section 4985.2, and the parties do not raise the issue, we do not address it. (Cf. *People ex rel. Strumpfer v. Westoaks Investment #27* (2006) 139 Cal.App.4th 1038, 1050 [43 Cal.Rptr.3d 548] (*Strumpfer*) [addressing the use of a petition for a writ of mandate to challenge a county's refusal to grant relief under § 4985.2].)

of Bank of America's borrowers did not constitute "circumstances beyond the taxpayer's control." (§ 4985.2, subd. (a).) Therefore, First American is not entitled to cancellation of the penalty under section 4985.2, subdivision (a).

■ As an initial matter, we note that the statutory language refers to "circumstances beyond the *taxpayer's* control." (§ 4985.2, subd. (a), italics added.) First American is not the taxpayer.[7] However, the trial court recognized that First American was acting as an *agent* of the taxpayer in transmitting payment of the taxes assessed against the taxpayers. When we consider whether the delay in payment was due to circumstances beyond the taxpayer's control, our inquiry will therefore include whether the delay in payment was due to circumstances beyond the control of the *taxpayer's agent*, First American. (Cf. *ZC Real Estate Tax Solutions, supra,* 191 Cal.App.4th at p. 384 & fn. 4 [focusing on the actions and policies of the tax services company, not the taxpayer, in determining whether an error by the tax services company causing a delay in real property tax payment was a circumstance beyond the taxpayer's control within the meaning of § 4985.2].)[8]

It is undisputed that First American failed to timely transmit the tax payment because it made a mistake in formatting a spreadsheet that listed the entities on behalf of which it needed to initiate wire transfers. The line on the spreadsheet listing Bank of America was inadvertently formatted so that it was hidden. Whether these circumstances are "beyond the taxpayer's control" within the meaning of section 4985.2, subdivision (a) is a matter of statutory interpretation, to which we apply a de novo standard of review. (*Jackson, supra,* 105 Cal.App.4th at p. 970; *Raytheon, supra,* 159 Cal.App.4th at p. 34.)

The only case to consider the meaning of the term "circumstances beyond the taxpayer's control" in section 4985.2, subdivision (a) is *ZC Real Estate Tax Solutions, supra,* 191 Cal.App.4th 378. In that case, a tax services company

---

[7] Taxes for real property are assessed on "persons owning, claiming, possessing, or controlling it on the lien date." (§ 405, subd. (a).)

[8] We note that in the context of cancellation of penalties for late payment of federal income tax—which First American refers to in its argument—a similar rule as to the late payments caused by a taxpayer's agent applies. "The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing . . . ." (*United States v. Boyle* (1985) 469 U.S. 241, 252 [83 L.Ed.2d 622, 105 S.Ct. 687] (*Boyle*).) We acknowledge that because a tax services company functions as the taxpayer's agent for purposes of the relief available under section 4985.2, situations may arise in which circumstances *beyond* the control of the taxpayer but within the control of the tax services company cause the taxpayer to incur late payment penalties as a lien against the taxpayer's real property. In such a situation, however, the taxpayer has the recourse of bringing a lawsuit against its lender (who engaged the tax services company) or the tax services company to recover the amount of the penalty and other consequential damages caused by acts or omissions of the lender or the tax services company.

handling the payment of property taxes for its clients made an error in addressing the envelope in which it mailed the tax payments, sending the payment to San Francisco instead of to Stanislaus County. (*Id.* at p. 381.) When the error was discovered, it was too late to make a timely payment. (*Ibid.*) The court concluded that the tax services company was not entitled to cancellation of the penalty under section 4985.2, subdivision (a) because, among other things, the delinquent payment was not due to circumstances beyond the taxpayer's control. (*ZC Real Estate Tax Solutions*, at p. 385.) As it explained, the tax services company's failure to send the payment to the correct address was "clearly" within its control, as was its failure to discover its error in a timely manner. (*Ibid.*)

First American's error in formatting its spreadsheet which it used to initiate the wire transfers is very similar to the error in *ZC Real Estate Tax Solutions* of misaddressing an envelope. Both are clerical errors that were plainly inadvertent, but which were within the parties' control and avoidable. In this case, the payment would have been timely if First American would have acted differently in formatting its spreadsheet, in designing its processes for initiating wire transfers or in taking additional steps to confirm wire transfers before the payment deadline. Following *ZC Real Estate Tax Solutions, supra*, 191 Cal.App.4th 378, 385, we conclude that First American's failure to timely transmit the tax payment was not due to a circumstance beyond its control.

■ First American advocates that we reach a different conclusion, interpreting section 4985.2, subdivision (a) as meaning that a circumstance is beyond the taxpayer's control anytime that a circumstance arises "*despite* the taxpayer's exercise of ordinary care in the absence of willful neglect." (Italics added.) Thus, according to First American, as long as it exercised ordinary care and was not willfully negligent, we should conclude that the circumstance giving rise to the late payment was beyond its control. In essence, First American wants to read out of section 4985.2, subdivision (a) the requirement that the late payment be due to "circumstances beyond the taxpayer's control" and focus solely on the statutory requirements of ordinary care and the absence of willful neglect. (*Ibid.*) We reject this interpretation of the statute because it fails to give effect to each of its parts. "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1].) As we have explained, the statutory language contains four *separate* requirements, stated in the conjunctive. Giving effect only to the requirements of ordinary care and the absence of willful neglect would improperly ignore the statutory language requiring that the late payment be due to a circumstance beyond the taxpayer's control.

First American also relies on a different tax provision—section 6597, subdivision (a)(2)(B)—which provides: "If a person's failure to make a timely remittance of sales tax reimbursement or use tax is *due to a reasonable cause or circumstances beyond the person's control,* and occurred notwithstanding the exercise of ordinary care and the absence of willful neglect, the person shall be relieved of the penalty imposed by this subdivision." (Italics added.) As First American points out, section 6597, subdivision (b)(1) provides the following definition:

" 'Reasonable cause or circumstances beyond the person's control' includes, but is not limited to, any of the following:

"(A) The occurrence of a *death or serious illness of the person* or the person's next of kin that caused the person's failure to make a timely remittance.

"(B) The occurrence of an emergency, as defined in Section 8558 of the Government Code that caused the person's failure to make a timely remittance.

"(C) A natural disaster or other catastrophe directly affecting the business operations of the person that caused the person's failure to make a timely remittance.

"(D) The board failed to send returns or other information to the correct address of record, that caused the person's failure to make a timely remittance.

"(E) The person's failure to make a timely remittance occurred only once over a three-year period, or once during the period in which the person was engaged in business, whichever time period is shorter.

"(F) The person voluntarily corrected errors in remitting sales tax reimbursement or use tax collected that were made in previous reporting periods and remitted payment of the liability owed as a result of those errors prior to being contacted by the board regarding possible errors or discrepancies."

First American argues that we should rely on this definition to interpret the term "reasonable cause and circumstances beyond the taxpayer's control" in section 4985.2, subdivision (a). Specifically, First American points to the provision referring to a "failure to make a timely remittance" that "occurred only once over a three-year period" (§ 6597, subd. (b)(1)(A) & (E)). According to First American, because there is no evidence that it "previously failed to timely transmit a tax payment on behalf of its clients," we should rely on

section 6597, subdivision (b)(1) to conclude that First American established "reasonable cause and circumstances beyond the taxpayer's control" within the meaning of section 4985.2, subdivision (a).

■ There are two problems with this argument. First, the relevant statutory language is not the same. Section 4985.2, subdivision (a) refers to "reasonable cause *and* circumstances beyond the taxpayer's control," but section 6597, subdivision (a)(2)(B) refers to "reasonable cause or circumstances beyond the person's control." (Italics added.) " 'Use of the conjunction "and" in [one statute] indicates a contrasting meaning to [another statute's] disjunctive "or." In the former the public entity must act after both events occur, and in the latter either event allows an action.' " (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514].) Because the statutory requirements are more extensive in section 4985.2, subdivision (a)—requiring both reasonable cause *and* circumstances beyond the taxpayer's control—the definitions in section 6597, subdivision (b)(1) are inapposite. Second, the Legislature could have, but did not, include a statutory definition of the term "reasonable cause and circumstances beyond the taxpayer's control" in section 4985.2.
■ "A venerable canon of statutory interpretation provides: ' " ' "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." ' " ' " (*Collins v. Department of Transportation* (2003) 114 Cal.App.4th 859, 867–868 [8 Cal.Rptr.3d 132].) Therefore, we may infer from the fact that the Legislature did not include specific statutory definitions in section 4985.2 but did include them in section 6597, subdivision (b)(1), that a different legislative intent existed about how the two statutes should be interpreted, and that the definitions in section 6597, subdivision (b)(1) were not intended to apply to section 4985.2, subdivision (a).

First American also suggests that we look to the case law interpreting a federal income tax statute—title 26 United States Code section 6651—to inform our analysis of whether "circumstances beyond the taxpayer's control" gave rise to the late tax payment at issue here. That provision states: "In case of failure—[¶] (1) to file any return required under [specific provisions] . . . on the date prescribed therefor (determined with regard to any extension of time for filing), *unless it is shown that such failure is due to reasonable cause and not due to willful neglect*, there shall be added to the amount required to be shown as tax on such return [a specific penalty]." (26 U.S.C. § 6651(a), italics added.) First American contends that the case law interpreting this provision is useful here because "[t]he phrase 'reasonable cause' as used in this section has been interpreted to include circumstances outside a taxpayer's reasonable control which result in a delinquent tax filing." (See, e.g., *Boyle, supra*, 469 U.S. at p. 248, fn. 6 [discussing federal regulations implementing

26 U.S.C. § 6651, which provide relief from late filings due to reasonable cause based on circumstances beyond a taxpayer's control, such as "postal delays" and "illness"].) However, the logic of First American's argument is flawed. Unlike section 4985.2, subdivision (a), the federal statute does not *require* a taxpayer to establish "circumstances beyond the taxpayer's control." (*Ibid.*) Although cases interpreting title 26 United States Code section 6651 would be helpful in interpreting the phrase "reasonable cause," they are not relevant to deciding whether "circumstances beyond the taxpayer's control" gave rise to a tax delinquency (§ 4985.2, subd. (a)).

Both parties contend that the legislative history of section 4985.2 supports their position. We have reviewed the legislative history materials obtained from the parties, as well as through our own research, but have not found those materials to be particularly instructive. As *ZC Real Estate Tax Solutions* observed in its review of the legislative history of section 4985.2, the most relevant statement concerning the meaning of the phrase "circumstances beyond the taxpayer's control" is the statement by the legislation's sponsor that " '[t]he thrust of the measure is aimed at people who are hospitalized or quite ill and cannot make a timely property tax payment due to the circumstances.' " (*ZC Real Estate Tax Solutions, supra,* 191 Cal.App.4th at p. 383.) The legislative history contains no support for First American's position that circumstances beyond the taxpayer's control should be found to exist in any situation in which the taxpayer exercised ordinary care and avoided willful neglect.

█ Giving effect to each portion of the statutory language and following the approach in *ZC Real Estate Tax Solutions, supra,* 191 Cal.App.4th 378, we conclude that an inadvertent but avoidable clerical error by an employee of a tax services company that causes a tax payment to be made beyond the statutory deadline is not a circumstance beyond the taxpayer's control, regardless of the exercise of ordinary care. Accordingly, we determine that the trial court erred in concluding that First American established the requirements of section 4985.2, subdivision (a) for cancellation of the late payment penalty.[9]

C.  *Section 4985.2, Subdivision (b) Is Not Applicable Because First American Did Not Make an Inadvertent Error in the Amount of Payment*

The second issue is whether, as the trial court concluded, subdivision (b) of section 4985.2 provides a ground for cancellation of the penalty paid by First American.

---

[9] Because we have concluded that First American did not establish that the late payment was due to circumstances beyond the taxpayer's control, we need not and do not determine whether substantial evidence supports the trial court's factual finding that First American exercised ordinary care.

■ According to that provision, cancellation of a penalty is warranted when "[t]here was an inadvertent error in the *amount of payment* made by the taxpayer . . ." and the proper amount is paid within 10 days of notice of the shortage. (§ 4985.2, subd. (b), italics added.) The legislative history provided by the parties indicates that the provision was enacted to address the situation in which a taxpayer inadvertently paid the wrong amount due to a juxtaposition or a mistaken transcription of numbers. (Assem. Com. on Revenue & Taxation, Rep. on Assem. Bill No. 1336 (1977–1978 Reg. Sess.) June 6, 1977.)

First American acknowledges that there was not an inadvertent error in the *amount* of payment made on behalf of Bank of America or on behalf of the taxpayers who were Bank of America's borrowers. On the contrary, *no payment whatsoever* was made on behalf of those entities by the statutory deadline. Thus, on its face, subdivision (b) of section 4985.2 does not apply here.

However, First American argues that a different rule should apply in the context of the CORTAC program. It argues that because a tax services company operating under the CORTAC program sends the County a *single* electronic file identifying *all* of the parcels and *all* of the clients for which it will be transmitting payment by wire transfer, an error in the amount of the *total* payments made by the tax services company on behalf of its clients for a specific tax period should be considered "an inadvertent error in the amount of payment made by the taxpayer" within the meaning of section 4985.2, subdivision (b).

We reject First American's argument under the facts of this case. As described in the record, some tax services companies participating in the CORTAC program send a *single* wire transfer encompassing *all* of their clients, but First American is not among them. Although we do not decide the issue, it may be plausible to argue that an inadvertent omission of one client's payment amount from a *single* wire transfer is an inadvertent error in the *amount* of payment. That argument is plausible because the tax services company would be making a *single payment*, and that payment would be in the wrong amount. Here, however, First American did not make a single consolidated payment for all of its clients. Each client paid by *separate* wire transfer. Bank of America's separate payment was not in the wrong *amount*; it was simply not made *in any amount* by the statutory deadline. Therefore, subdivision (b) of section 4985.2 does not apply regardless of the fact that the payment was made through the CORTAC program.

We therefore conclude that neither subdivision (a) nor subdivision (b) of section 4985.2 is applicable to the facts of this case, and the trial court erred

in interpreting those provisions to require the County to cancel and refund the penalty paid by First American.[10]

## DISPOSITION

The judgment is reversed.

Huffman, Acting P. J., and McDonald, J., concurred.

On June 10, 2011, the opinion was modified to read as printed above.

---

[10] We acknowledge that First American presents a sympathetic case for cancellation of the penalty, as it missed the payment deadline due to an inadvertent error and corrected the problem by making payment as soon as possible after the error was discovered. Nevertheless, because the statutory requirements for cancellation were not met, no grounds exist for an order requiring the County to cancel and refund the penalty.